# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

CARL SPENCER,

              Defendant.

**REPORT AND
RECOMMENDATION**
13-CR-6027

## Preliminary Statement

By text Order of Judge David G. Larimer, dated February 14, 2013, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 9). On February 14, 2013, defendant Carl Spencer was indicted on one count of reentry of removed alien, one count of false claim to United States citizenship, and one count of aggravated identity theft. See Indictment (Docket # 8). Currently before the Court are defendant Carl Spencer's motions to suppress tangible evidence seized from Spencer and statements Spencer made to law enforcement on the date of his November 9, 2012 arrest. (Docket # 13). The Government filed papers in opposition to defendant's motion. (Docket # 17). A suppression hearing was held on November 6, 2013, after which the Government and defense counsel both filed supplemental briefs. (Dockets ## 36, 37). The following is my Report and Recommendation as to the defendant's suppression motions.

**Findings of Fact**

The testimony during the November 6, 2013 suppression hearing revealed that in September 2012, Immigration and Customs Enforcement ("ICE") Deportation Officer Eric Pecoraro (hereinafter "Officer Pecoraro" or "Pecoraro") received information that defendant Carl Spencer was a criminal alien "living in the area of Hague Street" in Rochester, New York. See Transcript of November 6, 2013 Hearing (hereinafter "Tr.") (Docket # 33) at pp. 38-39. The tipster also informed Pecoraro that Spencer was seen driving "a gold Nissan sedan." Tr. 39. Pecoraro knew from his review of Spencer's immigration file and having checked immigration databases that Spencer was a citizen of Jamaica and was "illegally present in the United States." Tr. 39-40. Pecoraro also learned that Carl Spencer was also known by the aliases "Brother Brother" and "Barrington Stewart." Tr. 41.

Two months after receiving the tip on Spencer's location and vehicle, Pecoraro decided to initiate a "team surveillance" in the Hague Street area. Tr. 42. For reasons never explained at the suppression hearing, Pecoraro focused the surveillance on 553 Hague Street. Tr. 42-44. Surveillance was initiated on the evening of November 8, 2012, but no observations of Spencer were made. Tr. 66. Early the next morning, on November 9, 2012, Pecoraro assembled the surveillance team (consisting of "at least" eight members) and planned the surveillance operation. During the

2

November 9th meeting, color photographs of Spencer were distributed
and team members were  given a physical description of Spencer.[1]
Tr. 25, 27, 66.   Pecoraro and the rest of the law enforcement
surveillance team arrived at 553 Hague Street on November 9, 2012
at approximately 6:00 a.m. in several unmarked law enforcement
vehicles.  Tr. 44-45, 64.

Pecoraro was the "team leader" "in charge of the operation."
Tr. 45.  Pecoraro was partnered with ICE Deportation Officer David
McLean that day in an unmarked light blue Dodge Durango.  Tr. 44.
Pecoraro and McLean's vehicle began the morning in the "primary
surveillance position" where they could primarily see 553 Hague
Street, but "switched off" later that morning with Immigration
Enforcement Agent Paul Bishop (hereinafter "Agent Bishop" or
"Bishop") and Deportation Officer Anne Miller (hereinafter "Officer
Miller" or "Miller"), who were then "given the primary duty of
actually surveilling 553 Hague Street" and were in the primary
surveillance position.  Tr. 44, 65.  Pecoraro communicated with
members of the surveillance team "[v]ia radio."  Tr. 46.

Once they moved into the primary surveillance location, Agent
Bishop and Officer Miller regularly radioed Pecoraro with their
observations and descriptions of individuals they observed at 553

_____

[1]   There was no testimony at the suppression hearing about
what preparations were made by Pecoraro or team members in
connection with the November 8, 2012 surveillance of 553 Hague
Street or whether team members had photographs or a physical
description of Spencer for the evening surveillance.

Hague Street.  Tr. 7-8, 46.  Bishop had never previously seen Carl Spencer, but testified that Spencer had been described at the early morning surveillance team meeting as a black male who was 5 feet 9 inches tall, weighed about 160 pounds and was in his 40s.  Tr. 9. Bishop had a color photograph of Spencer with him in his vehicle during the surveillance.  Tr. 25-26.  Bishop and Officer Miller conducted their surveillance while seated in an unmarked green Dodge Caravan positioned with a direct view of 553 Hague Street. Tr. 8, 10.  Bishop testified that he had binoculars with him, but he was "able to see the premises without the aid of binoculars." Tr. 10.    Parked in the driveway of 553 Hague Street, Bishop observed a "gold or tan" colored four-door sedan parked "facing down the driveway towards the street."  Tr. 12.

At one point during his surveillance, Bishop observed a young, short, "heavier set" black male - who did not match defendant Spencer's description - exit the premises.  Tr. 14.  Bishop radioed his team to inform them that the individual "was in and out of the house, walking about the house."  Tr. 14.  Bishop saw this man "throughout the morning walking down the street, in and out of the house."  Tr. 17.  At approximately 9:00 a.m., Bishop observed "a large transportation van" pull up in front of 553 Hague Street which "totally" obscured Bishop's view of the house.  Tr. 18. Bishop testified that the driver of the van got out and walked around to the other side of the van.  Tr. 18.  Bishop testified

4

that he was a "[l]ighter skinned male," but he "was not able to make out an identity" because he could not see his face.  Tr. 18-19.  About five minutes later, the driver got back into the van and left the premises.  Tr. 18, 27.

At approximately 11:30 a.m., Bishop observed a man exit the residence and get in the passenger side of the sedan parked in the driveway.  Moments later, Bishop observed a second male individual exit 553 Hague Street.  This second individual then "walked across the front of the house towards the car, walked across the front of the car," and then entered the sedan on the driver's side, "got into the driver's seat and then closed the door."  Tr. 15.  The second individual was "[a] black male, approximately in his forties, a height of approximately five nine, five ten, and a weight of approximately 170 pounds."  Tr. 16.  Bishop testified that he was able to see the second individual "with my eyes," but also utilized his binoculars to look at him.  Tr. 20.  However, Bishop testified that he was not able to identify the driver of the vehicle as defendant Spencer.  Tr. 20.

Bishop radioed his team to inform them that the two men had left the residence, gotten into the vehicle, "[a]nd the vehicle was now proceeding down the driveway."  Tr. 16, 20.  Over the radio, Bishop informed the rest of the surveillance team of the physical description of the driver of the sedan.  Bishop testified he recalled providing the gender, race, and the approximate height and

5

weight of the individual who was driving the sedan.   Tr. 36-37.
Bishop acknowledged that the physical and racial description he
provided as to the driver was "at or near the information" that he
had "previously been provided with respect to the individual Carl
Spencer."  Tr. 37.   However, Bishop testified he never indicated to
the surveillance team that the driver "fit the physical
characteristics of the target [Spencer]" of the surveillance
operation.  Tr. 20-21.

Pecoraro testified that the description of the driver of the
vehicle provided by Bishop matched "the description of Mr.
Spencer."   Tr. 46-47.   Accordingly, Pecoraro "felt that I had
reasonable suspicion that the individual driving the vehicle was
Carl Spencer, and I ordered them to wait until he got a safe
distance to do a traffic stop."  Tr. 48.  Officer Miller, following
the order of Officer Pecoraro, followed the sedan and initiated a
traffic stop of the vehicle at the corner of Child Street and
Wilder Street by activating the van's emergency lights and siren.
Tr. 21-22.   Bishop testified that the driver of the sedan pulled
the car over "immediately."   Tr. 31.   Miller parked the van in
front of the sedan, "blocking it from moving forward."   Tr. 32-33.
Three of the law enforcement team's vehicles immediately arrived at
the scene of the traffic stop, and two police vehicles – including
Pecoraro's vehicle – pulled up behind the sedan and one parked
"alongside of it."  Tr. 33, 69.   The sedan "was surrounded on three

sides and then the fourth side was the curb area." Tr. 33.  Bishop exited the van and approached the passenger side of the sedan.  Tr. 24.  Bishop told the individual in the passenger seat "to remain seated in the seat and to put his hands on his lap."  Tr. 24.

When Pecoraro arrived at the scene of the traffic stop, he immediately exited his vehicle and approached the driver's side of the sedan with Officer McLean.  Pecoraro was wearing his ICE vest with "ICE Police" written on the front and back, a bullet-proof vest, body armor with the ICE badge and logo on the front, and his ICE badge and firearm on his waist.  Tr. 49-50.  None of the officers had their guns drawn at this time. Tr. 32, 50.  Pecoraro testified that the driver's side window was down and he identified himself "as Deportation Officer Pecoraro with the Department of Homeland Security," and ordered the driver to "[p]ut the car in park, turn off the ignition, hand me the keys."  Tr. 52.  The driver complied with Pecoraro's requests. Tr. 52.  Pecoraro then asked the driver for identification, and the driver handed him a Georgia State driver's license bearing the name Clyde Edward Crenshaw. Tr. 52-55.  Pecoraro asked the driver what his name was, and the driver responded "Clyde Crenshaw."  Tr. 71.  Pecoraro also asked the driver what his citizenship was, and the driver "made several statements that he's a U.S. citizen" and said his name was "Clyde Crenshaw."  Tr. 52-53, 71.  Pecoraro testified that the photograph on the Georgia license matched the individual who was in

the driver's seat of the sedan.  Tr. 55.  Pecoraro recognized the driver of the sedan to be "Carl Spencer a/k/a Barrington Stewart, Brother Brother."  Tr. 56.

After concluding that the driver was Spencer, Pecoraro told Spencer to step out of the vehicle because Pecoraro "was going to place him under arrest."  Tr. 56.  Spencer followed Pecoraro's order and got out of the car.  Pecoraro performed a "pat-down search" and "searched him from head to toe making sure that – for safety reasons, there are no weapons."  Tr. 56-57.  Pecoraro did not find any weapons on Spencer's person.  Tr. 57.  Pecoraro then handcuffed Spencer and placed him in the rear seat on the passenger side of Pecoraro's Dodge Durango.  Tr. 57.  During the traffic stop, Pecoraro seized Spencer's wallet from his person and went through the contents of the wallet for "[s]afety, just inventory" to determine if there was anything in it that was harmful and to keep a record of the cash and personal items found therein.  Tr. 58, 74.  While searching the wallet, Pecoraro saw two additional forms of identification, including (i) "a piece of paper with the name Barrington Stewart on it," and (ii) "identification with the name Clyde Crenshaw."  Tr. 58, 74.

Pecoraro testified that after placing Spencer in the back seat of the Durango, he asked Spencer a few questions, including "Where were you born?"  Tr. 59.  Pecoraro asked these types of questions as "part of our alienage basic pedigree information."  Tr. 59.

Pecoraro admitted during the suppression hearing, however, that at the time he asked Spencer about his citizenship he already knew his citizenship and alien information from his review of Spencer's immigration file.   Tr. 61.   Upon being questioned about his citizenship, Spencer told Pecoraro that Spencer's "parents were born in the United States.  His brothers were, his sisters.  You know, just general family members that were born here and he was a United States citizen."   Tr. 61.   Pecoraro testified that once Spencer started making statements that he was a United States citizen, Pecoraro read Spencer his <u>Miranda</u> rights using a rights card that he keeps in his wallet.   Tr. 59-60.   Pecoraro testified that after he advised Spencer of his <u>Miranda</u> rights, Spencer acknowledged that he understood those rights.   Tr. 62.   Pecoraro did not make any notations in any reports or documents that he read Spencer his <u>Miranda</u> rights.   Tr. 79.

Finally, during the suppression hearing Pecoraro testified that after he ordered Spencer out of his sedan, Spencer "yelled" several times to his passenger to "call my lawyer."   Tr. 77-78. Spencer referenced calling his lawyer both "before and after" he was read his <u>Miranda</u> rights, and "before and after" he was placed in the back of the police vehicle.   Tr. 78.   Spencer was eventually transported to the Batavia Detention Facility.   Fingerprints were utilized to positively identify the defendant as Carl Spencer.   Tr. 79.

## Discussion

Spencer seeks to suppress both the statements he made to police at the time of his arrest as well as any physical evidence seized during his arrest.  He argues that (1) law enforcement lacked reasonable suspicion to stop the vehicle he was driving on November 9, 2012, and (2) any statements he made to law enforcement after he was stopped were obtained in violation of his <u>Miranda</u> rights.  <u>See</u> Defendant's Memorandum of Law (Docket # 37).

<u>Reasonable Suspicion to Stop Vehicle</u>: The Government argues that law enforcement had collectively gathered enough information to reasonably suspect the driver of the vehicle leaving  553 Hague Street the morning of November 9, 2012 to be an illegal alien and thus the stop of the vehicle to investigate further was not violative of Spencer's Fourth Amendment rights.

On April 22, 2014, the Supreme Court reiterated the standard under which investigative stops are measured:

> The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417-418 (1981); <u>see also</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1968). The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990). The standard takes into account "the totality of the circumstances—the whole picture." <u>Cortez</u>, <u>supra</u>, at 417. Although a mere "'hunch'" does not create reasonable suspicion, <u>Terry</u>, <u>supra</u>, at 27, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and

"obviously less" than is necessary for probable cause, United States v. Sokolow, 490 U.S. 1, 7 (1989).

Navarette v. California, -- S. Ct. --, 2014 WL 1577513, at *3 (Apr. 22, 2014). Navarette is particularly relevant here because it addressed the special concerns evident when an investigative stop is "based on information from anonymous tips." Id.

> Of course, "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity." White, 496 U.S. at 329 (emphasis added). That is because "ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations," and an anonymous tipster's veracity is "'by hypothesis largely unknown, and unknowable.'" Ibid. But under appropriate circumstances, an anonymous tip can demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." Id. at 327.

Id.; see United States v. Freeman, 735 F.3d 92, 97 (2d Cir. 2013)("Anonymous tips, without further corroboration by the police to demonstrate that the tip has sufficient indicia of reliability, are insufficient to provide the reasonable suspicion necessary for a valid Terry stop.").

Courts, including the Supreme Court, have often struggled with the legality of investigative stops based, in whole or in large part, on anonymous tips. In Alabama v. White, the tipster told police that a woman driving from a particular residence to a particular hotel in a brown Plymouth station wagon with a broken tail light was transporting cocaine. Police stopped the car and found cocaine in the vehicle. Although describing it as a "close case," the Supreme Court found the stop of the vehicle was based

on reasonable suspicion of criminal activity.  The Court held that the ability of the tipster to predict future behavior "demonstrated inside information" and, as a result, it was "reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities."  496 U.S. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.").

In <u>Florida v. J.L.</u>, 529 U.S. 266 (2000), the police received a bare bones anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  <u>Id.</u> at 268.  When police arrived at the bus stop shortly thereafter, they observed a young black male in a plaid shirt.  The police stopped him, frisked him, and found a gun in his pocket.  <u>Id.</u>  However, because the tipster did not predict future behavior, did not explain how he knew about the weapon or how he knew the suspect, the information did not rise to the level of reasonable suspicion.  <u>Id.</u> at 271 ("All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.").

Most recently, in a case described again as a "close call," a divided Supreme Court struggled with the sufficiency of an

anonymous tip.  At issue in <u>Navarette</u> was an anonymous 911 call accusing an individual driving a Silver Ford 150 pickup with plate number 8-D-94925 of running the "reporting party off the roadway" at a specific location.  2014 WL 1577513, at *2.  Police responded to the area and spotted the truck.  After following the vehicle for about five minutes, the police pulled the truck over.  As the responding officers approached the truck, they smelled marijuana. The truck was searched and thirty pounds of marijuana were seized from the truck bed.  The Court found that the 911 caller was sufficiently reliable to credit the allegation that the driver of the truck tried to run the caller off the highway and this justified an investigative stop.  The Court found that the fact that (1) the caller "necessarily claimed eyewitness knowledge" of the dangerous driving, (2) must have  known that the truck was near the location where it was stopped, and (3) used the 911 system to report the incident and, in doing so, was presumably aware that 911 calls are recorded and traceable, all made the tip more reliable than the "bare bones" tip found insufficient in <u>J.L.</u>   2014 WL 1577513, at *4.

The issue here is not whether at the time of the stop the government had reasonable suspicion that Spencer was illegally present in the United States.  Officer Pecoraro's pre-surveillance review of Spencer's immigration file provided ample basis for law enforcement to stop Carl Spencer.  Rather, the issue is whether the

police had enough specific and articulable facts to provide a reasonable basis to believe the person driving the sedan was Carl Spencer.  That the driver of the car turned out to be Carl Spencer is irrelevant to the Court's analysis.  The reasonableness of the agents' suspicions as to who was driving the car must be measured by what the officers knew before they initiated the traffic stop. J.L. 529 U.S. at 271.  For the stop to be constitutional, at the time of the stop the agents must have had a particularized and objective basis for believing that the person they suspected as being Carl Spencer was driving the vehicle.

The anonymous tip Pecoraro received in September 2012 would not, in itself, have a sufficient indicia of reliability to support the stop of the vehicle.

> Anonymous tips differ from those for which the source is known on two determinative grounds: (1) ability to assess the credibility and reputation for honesty of the tipper and (2) holding the informant accountable for false reporting. Information from a known informant can be assessed for reliability in a way that information from an unknown one simply cannot.

Freeman, 735 F.3d at 97-98 (internal citations omitted).  Moreover, the Government did itself no favors in presenting scant evidence about the anonymous tip at the suppression hearing.  Totally absent from Officer Pecoraro's testimony was any information about the tip that the Court could consider in assessing its credibility.  How did the tip come in?  Was it a phone call?  Was it in writing?  Did the tipster say how he or she knew Spencer or for how long he or she

knew Spencer?  What details about Spencer did the tipster provide?
Did the tipster say anything about how he or she knew the model and
color of the car Spencer was supposedly driving?  Had the tipster
seen the car or been in the car?  Why could the tipster only give
the "general area" that Spencer allegedly lived in?  Had the tipster
seen Spencer in this neighborhood?  If so, when?  Were there any
reports prepared by Officer Pecoraro confirming or documenting the
tip?[2]  Any of these details would have been relevant to the Court's
task here because a tipster's "explicit and detailed description"
of events observed or a "statement that the event was observed
first-hand" provides a court justification to give the tip "greater
weight than might otherwise be the case."  <u>Illinois v. Gates</u>, 462
U.S. 213, 234 (1983).

Even the facts connecting Spencer to 553 Hague Street were
frustratingly left unexplained by the Government.  The tipster was
only able to claim that in September 2012 Spencer was living in the
"area" of Hague Street.  How did it come about that two months later
law enforcement focused on 553 Hague Street?  There must have been
some reason that law enforcement decided to devote substantial
surveillance assets to this specific location.  Was it another tip?
Was it because law enforcement noticed the gold car parked in the

_____

[2] If any such reports existed, Rule 26.2 of the Federal Rules
of Criminal Procedure would have required them to be turned over to
defense counsel.  But, no reports corroborating Pecoraro's contact
with the tipster were introduced by the Government at the
suppression hearing.

15

driveway?  If it was the car, when did law enforcement first observe the car?  Was the car present on the night of November 8, 2012 when Pecoraro and his team were conducting a surveillance?  Where else did law enforcement look for Spencer?  Again, the Court is convinced that many of these questions could have been asked and answered by Bishop or Pecoraro, but for some reason the Government elected not to.

What the Court is left with then is a totally anonymous and random tip received from an unknown person via an unknown method of communication with an unknown connection to Spencer claiming that in September 2012 Spencer was seen living "in the area" of Hague Street and that he was driving a "gold Nissan sedan."  This information, in and of itself, would have been insufficient to justify the stop of the vehicle. Adams v. Williams, 407 U.S. 143, 147 (1972)("Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized.").  So the Court must next turn to whether the "anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that [Spencer] was engaged in criminal activity and that the investigative stop therefore did not violate the Fourth Amendment." Alabama v. White, 496 U.S. at 331; see United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007)("When the informant's tip, standing alone, lacks sufficient indicia of reliability because

it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of reasonable suspicion if sufficiently corroborated through independent police investigation.").   As the Second Circuit has stated, "a significant amount of corroboration will be required" where the informant is "completely anonymous."   Id. at 181.

At the moment of the stop, was there sufficient corroboration of the anonymous tip to provide police reasonable suspicion that the person who exited 553 Hague Street and began to drive the vehicle was the same person the tipster had identified as Carl Spencer?  The hearing testimony paid tribute to the closeness of this question. Both Agent Bishop and Officer Pecoraro were aware of the information the Government contends corroborated the tipster's claim.  Both were aware that the tipster stated that Spencer was living in the "area" of Hague Street.  Both were aware that the tipster said Spencer was driving a gold or tan Nissan sedan.  Both were obviously aware that a car matching that description was observed in the driveway of 553 Hague Street.  Yet, these two experienced law enforcement officers disagreed as to whether there was reason to believe Spencer was driving the sedan that left the driveway of 553 Hague Street on the morning of November 9, 2012.  Agent Bishop, who was in the primary surveillance location and had a direct view of Spencer as he exited the house and got in the sedan testified that he was unable to "positively identify" the driver as Spencer and radioed that

17

information to the rest of the team. Officer Pecoraro, on the other hand, did not observe Spencer leave the Hague street residence but also heard Bishop radio the physical characteristics of the person who got in the driver's side of the vehicle. Believing the description "matched" Carl Spencer, Pecoraro ordered the vehicle to be stopped.

Based on the totality of the circumstances, I find that Pecoraro's decision was supported by sufficient facts (although barely sufficient) to give rise to a reasonable suspicion. In making this determination, the Court must consider that the required reasonable suspicion standard is "not high." Richards v. Wisconsin, 520 U.S. 385, 394 (1997). It must be more than a "hunch," Terry v. Ohio, 392 U.S. 1, 27 (1968), but need not even rise to the probable cause level of certainty. United States v. Elmore, 482 F.3d at 179; see Alabama v. White, 496 U.S. at 330 ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "Suspicion, to be reasonable, therefore necessitates not only a focus upon a particular person, but also concentration on a specific series of events." United States v. Lifshitz, 369 F.3d 173, 188 (2d Cir. 2004).

Viewed within this prism, I find the "specific series of events" leading up to the stop of the vehicle satisfied the inexact reasonable suspicion standard.  The anonymous tip led the police to the "area" of Hague Street.  While the Government failed to reveal how or why the agents focused on 553 Hague Street, by definition that residence fits within the tipster's claim.  The observation of the tan Nissan sedan in the driveway provides some additional support for the tipster's knowledge of Spencer.  Finally, law enforcement's collective knowledge of Agent Bishop's physical description of the individual leaving the Hague Street residence and entering the driver's seat of the gold Nissan sedan provided added corroboration to reasonably suspect that the driver was Spencer.  Taken alone, none of these historical facts provide reasonable suspicion.  But aggregated and then viewed together "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," United States v. Oates, 560 F.2d 45, 61 (2d Cir. 1977), the stop of the Nissan was justified on something more than "inchoate suspicion or [a] mere hunch." United States v. Glover, 957 F.2d 1004, 1010 (2d Cir. 1992). Accordingly, I find that the stop of the vehicle Spencer was driving on November 9, 2012 was supported by "reasonable suspicion."

Probable Cause to Arrest Spencer: Within seconds of stopping the Nissan, Officer Pecoraro was at the scene and was able, for the first time, to personally observe the driver.   From his

investigation of Spencer's immigration file, and specifically his viewing of several photographs of Spencer, Pecoraro was able to confirm the driver was in fact the individual he knew as Carl Spencer. Accordingly, at that point law enforcement had probable cause to arrest Spencer as an alien found illegally in the United States. In his post-suppression hearing Memorandum of Law (Docket # 37), the defendant does not argue otherwise. Accordingly, police had the authority to search both Spencer and the vehicle as searches incident to his arrest. See Arizona v. Gant, 556 U.S. 332, 351 (2009)(Police may search a vehicle incident to the occupant's arrest "if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."). Any identification documents or other physical evidence seized after the stop were constitutionally obtained.

Post-Arrest Questioning of Spencer: The Government seeks to use in its case-in-chief the statements Spencer made to Officer Pecoraro about his citizenship and identity prior to formally being placed under arrest. However, formal arrest is not the test for determining custody status for purposes of Miranda. Even in the absence of an actual arrest, an individual shall be deemed to be in custody when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir.

1995)(citations omitted), <u>cert.</u> <u>denied</u>, 516 U.S. 927 (1995); <u>see</u> <u>United States v. Hall</u>, 421 F.2d 540, 545 (2d Cir. 1969)("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."). The test for custody is an objective one based on the totality of circumstances surrounding the particular encounter at issue.  <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984).  Indeed, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by <u>Miranda</u>." <u>Id.</u> at 440.

    The facts adduced at the suppression hearing confirm that this was no routine traffic stop.  A team of law enforcement officers were tasked with watching a particular residence and arresting a specific target of their investigation should he appear.  The officers had the suspect's background data, his immigration status and his photograph.  When it came time to stop the vehicle with Spencer in the driver's seat, officers did not approach the car as they would in an ordinary traffic stop.  Several police cars

surrounded the Nissan on all sides, effectively boxing in the vehicle from further movement.  Pecoraro went directly to the driver side window, looked at Spencer, identified himself as a law enforcement officer and immediately said: "Put the car in park, turn off the ignition, hand me the keys."  I determine that at the time the officers boxed in the Nissan sedan and Pecoraro seized the keys to the car, a reasonable person in Spencer's position would not feel free to depart.  See United States v. Badmus, 325 F.3d 133, 138 (2d Cir. 2003)(stating that a person may be in custody even absent formal arrest, and that it is sufficient "when law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave")(internal quotation mark and citation omitted); United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992)(the custody "inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave").  At that point, Spencer was effectively in custody and "entitled to the full panoply of protections prescribed by Miranda." Berkemer, 468 U.S. at 440.

During the suppression hearing, Agent Pecoraro suggested that the questions he asked Spencer before he formally placed him under arrest were routine pedigree questions.  In his post-hearing brief, defense counsel argued that such questioning did not qualify under the pedigree exception to Miranda.  See Defendant's Memorandum of Law (Docket # 37) at pp. 11-12.  The pedigree exception to Miranda

is premised on the principle that pedigree information solicited through routine questioning of arrested persons during the booking process does not implicate the protections afforded by Miranda. "Routine questions about a suspect's identity and marital status, ordinarily innocent of any investigative purpose, do not pose the dangers Miranda was designed to check; they are rather the sort of questions normally attendant to arrest and custody." United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986)(internal quotation mark and citation omitted).   In its post-hearing brief, the Government did not address the pedigree exception and I presume this means that it has abandoned any pedigree argument.   In any event, for substantially the same reasons discussed in United States v. Valentine, 657 F. Supp. 2d 388, 392-94 (W.D.N.Y. 2009), the pedigree exception to Miranda is not applicable to Pecoraro's questions. Pecoraro testified at the hearing that at the time he  asked Spencer about his identity and citzenship, he already knew who Spencer was, had already ascertained his alien status and his questions were not truly pedigree inquiries.  See Tr. 61; see Rhode Island v. Innis, 446 U.S. 291, 301 (1980)("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.").  Accordingly, it is my Report and Recommendation that defendant Spencer's pre-arrest statements be suppressed as obtained in violation of Miranda.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress tangible evidence (Docket # 13) be denied and to suppress statements (Docket # 13) be granted. **SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:      April 30, 2014
            Rochester, New York

24

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[3]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**</u>

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:     April 30, 2014
           Rochester, New York

---

[3] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).